WILLIAM H. ADDINGTON AND DONNA L. ADDINGTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Addington v. Commissioner
Docket No. 8891-76, 6909-79.
United States Tax Court
T.C. Memo 1980-46; 1980 Tax Ct. Memo LEXIS 539; 39 T.C.M. (CCH) 1073; T.C.M. (RIA) 80046; February 26, 1980, Filed William H. Addington and Donna L. Addington, pro se. Deborah A. Butler, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to and heard by Special Trial Judge Daniel J. Dinan, pursuant to the provisions of section 7456(c) of the Internal Revenue Code[1] and Rules 180 and 181, Tax Court Rules of Practice and Procedure.[2] The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: These cases were consolidated for trial, briefing and opinion. *541 Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to taxes: Taxable
Addition to Tax under
Docket No.
Year
Deficiency
Sec. 6653(a), I.R.C.
8891-76
1974
$1,931.00
6909-79
1975
5,381.00
$269.00
6909-79
1976
2,149.00
107.00
6909-79
1977
2,949.00
147.00
The issues for decision are (1) whether the petitioners sustained a theft loss in 1974, (2) whether petitioners are entitled to travel expense deductions in excess of those allowed by the respondent for the years 1974, 1975 and 1976, (3) whether tax return preparation and legal fees in the amount of $7,411, paid in 1977, are deductible as an ordinary and necessary business expense as the petitioners contend or as an excess itemized deduction as the respondent contends, and (4) whether any part of the underpayments of petitioners' 1975, 1976 and 1977 taxes were due to negligence or intentional disregard of rules and regulations under section 6653(a), Internal Revenue Code. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact together with exhibits attached thereto are incorporated herein *542 by this reference. Petitioners timely filed joint Federal income tax returns for the years 1974, 1975, 1976 and 1977. At the time the petition in Docket No. 8891-76 was filed, petitioner, William H. Addington, resided at 224 Elkhart Avenue, Elkhart, Kansas. At the time the "Amendment to Petition" in Docket No. 8891-76 was filed, petitioner, Donna L. Addington, resided at 7208 Lowell Avenue, Overland Park, Kansas. At the time the petition in Docket No. 6909-79 was filed, petitioner, William H. Addington, resided at 6820 Reeves, Fort Worth, Texas, and petitioner, Donna L. Addington, resided at 7208 Lowell Avenue, Overland Park, Kansas. Petitioner [3] was born and raised in Elkhart, Kansas. In 1948, he went into the business of buying, selling and storing grain. He purchased a small 18,000 bushel grain elevator in Elkhart in that year and operated it as a sole proprietorship under the name of Addington Grain Company, hereinafter referred to as "Elkhart." In 1955, he purchased a concrete grain elevator at Tucumcari, New Mexico, for $175,000. He paid $50,000 as a down payment on the purchase and financed the balance of the purchase price. The business was operated in the corporate *543 form under the name of Addington Grain Company, hereinafter referred to as "Tucumcari." In 1959, the petitioner purchased grain storage facilities at Hutchinson, Kansas, consisting of two steel buildings that could store 1,300,000 bushels of grain, together with related grain storage equipment. The business was operated in the corporate form for its fiscal years ended September 20, 1960 and 1961, under the name of Addington Grain Company, Inc., hereinafter referred to as "Hutchinson." By 1961, the petitioner had increased the grain storage capacity of "Hutchinson" to 7,500,000 bushels at a cost of $1,500,000, all of which was financed. As of October 1, 1961, "Hutchinson" elected to be taxed as a subchapter S corporation. In August of 1959, the petitioner moved to Wichita, Kansas. In 1960, the petitioner purchased grain storage facilities at Amarillo, Texas. The business was operated in the corporate form under the name *544 of Addington Grain Company, Inc., hereinafter referred to as "Amarillo." That corporation was dissolved on April 27, 1964. In 1958, the petitioner bought a cattle ranch in Carbon County, Wyoming; in 1960, he built a home in Wichita for which he paid cash of approximately $180,000. The petitioner was also the sole owner of other business enterprises. In February, 1962, he purchased a cattle ranch in Elko, Nevada, consisting of 150,000 acres of deeded land and approximately 237,000 acres of Federal grazing land. The purchase of the ranch was 100% financed. In February, 1962, he purchased a company known as Thousand Springs Trading Post in Nevada. In May, 1962, the petitioner purchased the Ranch Inn Motor Lodge, a 60 unit motel in Elko, Nevada, for $600,000. The purchase of the motel was 100% financed. In addition to storing grain which he bought in his grain elevators at Elkhart, Tucumcari and Hutchinson, the petitioner also stored grain owned by others, particularly the Commodity Credit Corporation, hereinafter referred to as "C.C.C." He issued warehouse receipts for the grain stored in his elevators which belonged to others. After he moved to Wichita, Kansas, in August, *545 1959, the financial records of the petitioner's many business enterprises were kept at his office in Wichita. In the latter part of 1959, the petitioner entered into a contract with the A.B. and T. Grain Company of Topeka, Kansas (hereinafter "A.B. and T."), whereby A.B. and T. agreed t manage Hutchinson. At the same time that the petitioner bought the cattle ranch at Elko, in February of 1962, A.B. and T. reported that shortgages in grain were occurring at Hutchinson. Grain in storage at Hutchinson, for which warehouse receipts had been issued, was being sold, the proceeds from the sale were going to the petitioner's office in Wichita, but the grain was not being replaced. From 1962 through 1965, petitioner's employees and employees of A.B. and T. complained to the petitioner of recurring shortages of grain in his storage facilities. From December 8, 1959 through February 8, 1965, Don Killman worked for A.B. and T. in Topeka, Kansas. A.B. and T. was under contract to manage Hutchinson and Mr. Killman was the person who maintained the Hutchinson grain inventory records. During 1962, 1963, 1964 and 1965, he was aware of continuing large shortages of grain at Hutchinson. The *546 shortages were caused by grain being loaded out of the elevator, i.e. sold, and not being replaced with purchased grain. It was Mr. Killman's opinion that the money received for the loaded out grain went to petitioner and was used by him in his many other businesses. Mr. Killman continually informed petitioner of the grain shortages. Mr. Killman prepared periodic reports of warehouse receipts to C.C.C. and daily registrar reports which accompanied warehouse receipts or other changes in inventory sent to the Merchants National Bank in Topeka, Kansas. He knew those reports were not accurate; they did not show the grain shortgages in the Hutchinson elevator. Petitioner knew that Mr. Killman was filing the false reports. When peitioner refused to correct the situation, Mr. Killman, on February 8, 1965, resigned. W. F. Allison was an employee of A.B. and T. and was the manager of Hutchinson from 1960 through the early part of 1965. He, too, was aware of various grain shortages at Hutchinson. Those shortages occurred as the result of loading out grain from the elevator at petitioner's request. The loadouts were not recorded in the grain inventory records. Mr. Allison discussed *547 this situation with petitioner who informed him that the money would become available to purchase grain to make up the shortages. Sometimes petitioner would replace the grain but the grain "would come and go." Monty Frazier worked for petitioner as an accountant from July or August, 1964 through December, 1965 or January, 1966, when petitioner closed his Wichita office. He kept the books of account for all of the petitioner's holdings, including the ranch in Nevada. Monies were taken from Hutchinson and Elkhart to pay off loans of the ranch and other loans to petitioner's various businesses. After Hutchison was refinanced in 1965, mortgages and loans were made between petitioner's various businesses in excess of $200,000 to $300,000. Large amounts of money were being charged to the C.C.C. by Tucumcari, Elkhart and Hutchinson for the storage of C.C.C.'s grain at those facilities but the quarterly storage checks were not being paid to them. Those storage checks had been assigned by the petitioner to Associates Discount of South Bend, Indiana, which had financed his $1,500,000 loan to expand the storage facilities at Hutchinson in 1960 and 1961. Income was not available, therefore, *548 to replace the grain shortages. In order to replaced the recurring grain shortages, the petitioner effected a series of loans and refinancings. On October 28, 1963, he took out two loans at the Denver United States National Bank, hereinafter Denver, for $36,700 each. He secured each of those loans with a warehouse receipt covering 2,800,000 pounds of Milo at Elkhart, for a total security of 5,600,000 pounds of Milo. On November 20, 1963, the petitoner took out a loan at Denver for $45,600 secured by a warehouse receipt covering 2,800,000 pounds of Milo at Tucumcari. On November 22, 1963, he took out another loan at Denver for $22,800 secured by a warehouse receipt covering 1,400,000 pounds of Milo at Tucumcari. When the petitioner moved to Wichia in August, 1959, his grain elevator at Elkhart was almost paid for. In 1963, he refinanced Elkhart with the Farmers Insurance Company in Wichita to obtain funds to replace grain shortages. In 1963, he borrowed $1,000,000 from Denver. The $1,000,000 was used to pay off the loan from Associates Discount of South Bend to expand Hutchinson. The quarterly storage checks due from C.C.C. to Tucumcari, Elkhart and Hutchinson were then *549 reassigned to Denver. In 1964, petitioner, increased the loan from Denver to $1,500,000. On May 19, 1965, the petitioner refinanced his ranch at Elko, Nevada, for $1,400,000 which was $600,000 more than the amount of the first mortgage on the ranch. There was a second mortgage holder on the ranch, however, who required that the petitioner pay him a $200,000 bonus to allow petitioner to refinance. The petitioner netted $382,572.73 from the $1,400,000 loan with which he could purchase grain to replace the shortages at Hutchinson. On November 9, 1965, petitioner borrowed $293,000 and issued ten false warehouse receipts to the lender as security for the bonds. Transamerica Corporation, as the bonding company that guaranteed the warehouse receipts, was required to repay the $293,000 loan. Sometime subsequent to May 15, 1966, Transamerica contracted with Mr. Orville Davis to prepare a schedule of daily grain shipments into and out of the Hutchinson elevator for the period January 1, 1960, through May 15, 1966, to be used in litigation against petitioner in the Kansas State courts. In November, 1965, the Kansas State Warehouse Department measured the grain in the elevator at *550 Hutchinson and determined that the facility was short approximately 421,000 bushels of grain belonging to C.C.C. The petitioner did not have the money to replace the grain and on November 5, 1968, filed a petition in bankruptcy. On August 20, 1969, the petitioner was granted a discharge in bankruptcy. In 1967 or thereabout, the petitioner was brought to trial on state charges of issuing false warehouse receipts on the Hutchinson facility during 1965 and was convicted of the offenses. In 1970, the petitioner was brought to trial on federal charges of theft of grain from C.C.C. during 1965 and was convicted of the charges. On the joint Federal income tax return that he and his wife filed for 1974, the petitioner claimed a long-term capital loss of $4,000,000 resulting from the alleged embezzlement and theft of buildings, land and equipment of Addington grain companies solely owned by petitioner, located in Kansas, New Mexico, Nevada and Texas. He also deducted $4,000,000 as an operating loss due to shrinkage (grain). In 1974, petitioner took over the management of 17 houses and two buildings in Elkhart, Kansas, that were owned by his father. In 1974, petitioner's father *551 was in his eighties. The houses and buildings were in run-down condition and the petitioner undertook the task of renovating them. The closest city to Elkhart, Kansas, of any considerable size, is Amarillo, Texas, which is approximately 150 miles south of Elkhart. In order to renovate the houses and buildings, petitioner made numerous trips to Amarillo to purchase materials for the repair of the houses and buildings. On his return for 1974, petitioner deducted the following amounts as ordinary and necessary business expenses: Mileage - 15,000 miles at $.15
$2,250
Gas and travel
1,024
Per diem - 35 days at $25
875
Total
$4,149
Respondent allowed $657 of the claimed mileage deduction and disallowed the remainder of the total claimed. On his return for 1975, petitioner deducted the following amounts as ordinary and necessary business expenses: Mileage - 15,000 miles at $.15
$2,250
15,000 miles at $.10
1,500
90 days in Wash., D.C. at $35
3,150
6 months in Amarillo at $30
5,400
Total
$12,300
Respondent allowed $657 of the claimed mileage deduction and disallowed the remainder of the total claimed. On his return for 1976, *552 petitioner deducted the following amounts as ordinary and necessary business expenses: Rooms and meals
$1,229
15,000 miles, first half,
Chevy at $.15
2,250
15,000 miles on
Cadillac, gas and
oil only at $.07
1,050
Total
$4,529
Respondent allowed $657 of the claimed mileage deduction and disallowed the remainder of the total claimed. On his 1977 return, petitioner deducted as ordinary and necessary business expenses on Schedule C, $500 paid for the preparation of the return and $6,911 in legal fees. The only income reported in petitioner's joint Federal income tax return for 1977, other than petitioner Donna L. Addington's wages of $24,038.68, was interest income of $66 and a net royalty payment from Panhandle Eastern in the amount of $518. The only item entered on Schedule C to petitioner's 1977 return is the claimed expense for the preparation of the return and legal fees in the total amount of $7,411. No business activity is listed, no income is reported and no other expenses are claimed. Upon audit of petitioner's 1974-1977 returns, respondent disallowed each of the claimed deductions, supra. OPINION Theft Loss
Section 165(a) *553 permits a taxpayer to deduct any loss sustained during the taxable year and not compensated for by insurance or otherwise. Section 165(e) provides that any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss. [4]
On his joint Federal income tax return for 1974, the petitioner claimed a long-term capital loss of $4,000,000 resulting from the embezzlement and theft of buildings, land and equipment of Addington grain companies solely owned by petitioner, located in Kansas, New Mexico, Nevada and Taxas. He also deducted $4,000,000 as an operating loss due to shrinkage (grain). At trial the petitioner introduced evidence attempting to show that his employees had embezzled property from him in the amount of $8,000,000 during the period 1959-1965 and *554 that he did not discover the amount of the loss until 1974. Deductions are strictly a matter of legislative grace and a taxpayer has the burden of establishing that he is entitled to any deduction claimed on his return. New Colonial Co. v. Helvering, 292 U.S. 435, 440 (1934).The taxpayer has the burden of proving that the Commissioner's determination is incorrect. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
The burden of proof reqired of a taxpayer to establish the the fact of a theft was enunciated by this Court in Allen v. Commissioner,16 T.C. 163, 166 (1951): Petitioner has the burden of proof. This includes presentation of proof which, absent positive proof, reasonably leads us to conclude that the article was stolen. If the reasonable inferences from the evidence point to theft, the proponent is entitled to prevail. If the contrary be true and reasonable inferences point to another conclusion, the proponent must fail. If the evidence is in equipoise preponderating neither to the one nor the other conclusion, petitioner has not carried her burden. See also, *555 Jones v. Commissioner, 24 T.C. 525, 527 (1955) and Elliott v. Commissioner, 40 T.C. 304, 311 (1963). The petitioner has not sustained his burden of proof since there is not a scintilla of evidence in this record that would point to the occurrences of the thefts claimed by him. The purported thefts alleged by petitioner may be divided into two categories, the cattle theft and the grain theft. Petitioner testified at trial that in 1958 and 1959 he had accumulated on his ranch in Wyoming 2,200 head of cattle which he estimated to be worth $580,000 as of the fall of 1959. He allegedly sold the cattle to a Don Perkins from Norfolk, Nebraska, in June, 1959, with delivery to take place on October 1, 1959. Petitioner testified that on October 1, 1959, Mr. Perkins did not have the money to pay for the cattle and he told Mr. Perkins that he could not take the cattle until he paid for them. Petitioner then testified that he delegated to his accountant, Orville Davis, the authority to complete the cattle sale with Mr. Perkins when Mr. Perkins obtained the money to pay for the cattle and that Mr. Davis sold to Mr. Perkins thirteen hundred and some head of *556 cattle for only $288,000. Petitioner then concludes that Mr. Davis stole the difference between the petitioner's $562,000 estimated value of the cattle and the actual $288,000 received for them, or $274,000. Petitioner further testified that he was not aware of the alleged theft until 1974. Contrary to petitioner's naked allegations of a theft of either cattle or the proceeds from the sale of cattle in 1959, there was introduced into evidence at trial an entry on Schedule 5 attached to the 1959 joint Federal income tax return signed and filed by the petitioners which lists income from the sale of a breeding herd at the Wyoming ranch in 1959 in the amount of $288,774. The petitioner knew in 1959 when he signed his return, the amount that he had received for the cattle. Mr. Davis testified at trial that after going to work for petitioner in October, 1959, he had heard that all the cattle on petitioner's Wyoming ranch had been sold but that the sale had occurred prior to the time that he first met petitioner and that he had nothing to do with collecting the amount for which the cattle had been sold.
The grain theft alleged by petitioner refers to shortages of grain at Hutchinson. *557 On November 9, 1965, petitioner borrowed $293,000 and issued 10 false warehouse receipts to the lender as security for the bonds. Transamerica Corporation, as the bonding company that guaranteed the warehouse receipts, was required to repay the $293,000 loan. Sometime subsequent to May 15, 1966, Transamerica contracted with Mr. Orville Davis to prepare a schedule of daily grain shipments into and out of the Hutchinson elevator for the period January 1, 1960, through May 15, 1966, to be used in litigation against petitioner in the Kansas State Courts. The schedule prepared by Mr. Davis was introduced into evidence at trial.
Incredibly, petitioner has computed from Mr. Davis' schedule the total amount of grain shortages at Hutchinson from January 1, 1960 through May 15, 1966, amounting to 3,341,963 bushels, multiplied by his estimate of the value of wheat during that period (including freight paid to Hutchinson) in the amount of $2.50 a bushel to arrive at a total of $8,354,907 which he alleges is the amount of the theft perpetrated against him by his employees. Again, petitioner contends that he did not discover this alleged theft until 1974. Other then the self-serving testimony *558 of petitioner, all of the evidence in this case shows that the grain shortages at Hutchinson were directly attributable to petitioner. The state conviction of petitioner for issuing false warehouse receipts on grain that was short at Hutchinson and the federal conviction for theft of 421,000 bushels of C.C.C. grain from Hutchinson in 1965 are compelling evidence of the petitioner's responsibility for the grain shortages at that facility. From December 8, 1959 through February 8, 1965, Don Killman worked for A.B. and T. in Topeka, Kansas. A.B. and T. was under contract to manage Hutchinson and Mr. Killman was the person who maintained the Hutchinson grain inventory records. During 1962, 1963, 1964 and 1965, he was aware of continuing large shortages of grain at Hutchinson. The shortages were caused by grain being loaded out of the elevator, i.e. sold, and not being replaced with purchased grain. It was Mr. Killman's opinion that the money received for the loaded out grain went to petitioner and was used by him in his many other businesses. Mr. Killman continually informed petitioner of the grain shortages. Mr. Killman prepared periodic reports of warehouse receipts to C. *559 C.C. and daily registrar reports which accompanied warehouse receipts or other changes in inventory sent to the Merchants National Bank in Topeka, Kansas. He knew those reports were not accurate; they did not show the grain shortages in the Hutchinson elevator. Petitioner knew that Mr. Killman was filing the false reports. When petitioner refused to correct the situation, Mr. Killman, on February 8, 1965, resigned. W. F. Allison was an employee of A.B. and T. and was the manager of Hutchinson from 1960 through the early part of 1965. He, too, was aware of various grain shortages at Hutchinson. He testified that those shortages occurred as the result of loading out grain from the elevator at petitioner's request. The loadouts were not recorded in the grain inventory records. Mr. Allison testified that he discussed this situation with petitioner who informed him that the money would become available to purchase grain to make up the shortages. Sometimes petitioner would replace the grain but the grain "would come and go." Monty Frazier worked for petitioner as an acountant from July or August, 1964 through December, 1965 or January, 1966, when petitioner closed his Wichita office. *560 He kept the books of account for all of the petitioner's holdings, including the ranch in Nevada. Monies were taken from Hutchinson and Elkhart to pay off loans of the ranch and other loans to petitioner's various business. He testified that after Hutchinson was refinanced in 1965, mortgages and loans were made between petitioner's various businesses in excess of $200,000 to $300,000. It is clear to us from the evidence of record that during 1960-1966, petitioner built a financial house of cards that finally collapsed. That collapse was due to petitioner's unwise financial maneuvering and manipulation and not to any theft or embezzlement by his employees. As petitioner himself testified "I'm not an accountant, I estimate there was $8,000,000 embezzled from me. I really don't know who did it. I know I had different people working for me; but I really don't know who did it." Respondent's contention that evidence that property has disappeared is not proof that there was a theft loss is correct. Bakewell v. Commissioner, 23 T.C. 803 (1955). On this record, we must sustain the respondent's determination. Travel Expenses
Section 162(a) provides for *561 the deduction of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. A taxpayer may be in the trade or business of being an employee. Primuth v. Commissioner, 54 T.C. 374 (1970). The burden of establishing that he is entitled to the deduction is on the petitioner. Welch v. Helvering, supra; Rule 142(a), Tax Court Rules of Practice and Procedure.
Section 274(d) circumscribes the application of section 162 by providing that no deduction shall be allowed for traveling expenses (including meals and lodging) while away from home unless the taxpayer substantiates the amount claimed with "adequate records or by sufficient evidence corroborating his own statement." Petitioner testified at trial that he kept no records or receipts for amounts allegedly expended for food and lodging on business trips in $1974, 1975 and 1976. We are, therefore, proscribed by section 274 from allowing petitioner the meal and lodging deductions claimed for 1974, 1975 and 1976. Petitioner had no records or reliable secondary evidence to substantiate the mileage expenses claimed on his 1975 and 1976 returns. For *562 1974, petitioner submitted a diary which he maintained to show various materials purchased by him to use in the renovation of the houses and buildings in Elkhart. By reviewing that diary, petitioner testified that he could determine which of the materials listed were purchased in Amarillo and how many trips he made from Elkhart to Amarillo to make those purchases. In response to an inquiry from respondent's counsel, petitioner testified that he made 21 trips from Elkhart to Amarillo in 1974, a round-trip distance of 300 miles for each trip. Even if we were to accept petitioner's uncorroborated testimony on this point, the total distance traveled during 1974 would have 6,300 miles, yet petitioner claimed a business expense deduction for 1974 on the basis of having driven 15,000 business miles. Respondent has allowed petitioner mileage expenses in the amount of $657 for each of the years 1974, 1975 and 1976. On this record, we believe that allowance to be an act of generosity. Respondent's disallowance of the remainder of the claimed travel expenses is mandated by the provisions of section 274(d) and is sustained. Tax Return Preparation and Legal Expenses
On his 1977 *563 return, petitioner deducted as ordinary and necessary business expenses on Schedule C, $500 paid for the preparation of the return and $6,911 in legal fees. Respondent disallowed the total claimed deduction of $7,411 as an ordinary and necessary business expense but did allow that amount as an excess itemized deduction. Respondent also allowed petitioner an itemized deduction of $216 for sales tax as determined from the sales tax tables. At trial, respondent represented that this adjustment would not adversely effect petitioner, that he ould still receive the full tax benefit from the deduction as he had claimed it on the return. Unfortuntely, such is not the case. We have, supra, susutained respondent's disallowance of the theft loss claimed by petitioner on his 1974 return. Thus, no net operating loss is available to carry forward to 1977. Petitioner's gross income as reported on his joint Federal return for 1977 is $24,039. If the $7,411 deduction was to be allowed as a deduction on Schedule C of his return, petitioner's adjusted gross income would be $17,212 and his Federal income tax liability would be $2,211. If, however, the $7,411 is taken as an itemized deduction, *564 together with the itemized sales tax deduction of $216 on Schedule A, petitioner's taxable income is $20,196 and his Federal income tax liability would be $2,949, computed as follows: Gross income
$24,623
Less: Total itemized deductions
$7,627
Less zero bracket amount
3,200
Excess itemized deduction
$4,427
4,427
Taxable income
$20,196
Because of respondent's representation, petitioner did not specifically address himself to submitting proof at trial on this issue. Based upon the entire record in this case, we have determined, however, that petitioner would not be entitled to deduct the claimed tax return preparation and legal fees from gross income, to arrive at adjusted gross income, in any event. It is clear from the evidence submitted at trial that petitioner was not engaged in his own business or practicing a profession in 1977. The only income reported on petitioner's joint Federal income tax return for 1977, other than petitioner Donna L. Addington's wages of $24,038.68, was interest income of $66 and a net royalty payment from Panhandle Eastern in the amount of $518. The only item entered on Schedule C to petitioner's 1977 return *565 is the claimed expense for the preparation of the return and legal fees in the total amount of $7,411. No business activity is listed, no income is reported and no other expenses are claimed. Section 62(1) provides that only deductions attributable to a trade or business carried on by the taxpayer, if such trade or business does not consist of the performance of services by the taxpayer as an employee (emphasis added) may be subtracted from gross income to arrive at adjusted gross income. Since petitioner was not engaged in his own business in 1977 or practicing a profession, the claimed business expenses are not deductible from gross income under section 62(1). Section 62(2) provides that only the following employee trade or business expenses may be deducted from gross income to arrive at adjusted gross income: (1) expenses of travel, meals and lodging while away from home in the performance of services as an employee, (2) other expenses covered by a reimbursement or other expense allowance arrangement by the employer, (3) transportation costs, and (4) outside salesmen's expenses. All other employee business expenses must be taken as itemized deductions on Schedule *566 A. Since the claimed expense of $7,411 does not fit within any of categories (1)-(4), supra, we must sustain respondent's adjustment. Negligence Penalty
Respondent has asserted the negligence penalty against petitioner for the years 1975, 1976 and 1977, pursuant to the provisions of section 6653(a), on the grounds that proposed underpayment of tax for those years was due to negligence or intentional disregard of rules and regulations. At trial, the reason for the assertion of the penalty became readily apparent. Upon auditing petitioner's 1974 return, respondent informed petitioner that his claimed net operating loss was not allowable. Despite that advice, however, petitioner claimed the net operating loss carryovers on his 1975, 1976 and 1977 returns. We find that the respondent erred in asserting the penalty provisions of section 6653(a) against petitioner. The statutory notice of deficiency for the years 1975, 1976 and 1977 is dated March 16, 1979. The petitioner for 1974 was filed in this Court September 27, 1976. Respondent well knew that petitioner was challenging his determination to disallow the net operating loss claimed on the 1974 return. Petitioner's *567 carryover of the net operating loss on his 1975, 1976 and 1977 returns was entirely consistent with his treatment of that item on his 1974 return. Decision will be entered for the respondent in docket No. 8891-76. Decision will be entered under Rule 155 in docket No. 6909-79.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years 1974-1977, unless otherwise incidated. ↩
2. Pursuant to the order of assignment, on the authority of the "otherwise provided" language of Rule 182, Tax Court Rules of Practice and Procedure↩, the post-trial procedures set forth in that rule are not applicable to this case.
3. Donna L. Addington is a party to these consolidated actions only because she filed joint Federal income tax returns with her husband for the years 1974-1977. When we refer to the petitioner hereinafter we will be referring to William H. Addington.↩
4. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(e) Theft Losses.--For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.↩